IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION

KARREN M. ABEL                                                                                        PLAINTIFF

VS.                                                            CIVIL ACTION NO. 3:09cv327-TSL-FKB

MICHAEL J. ASTRUE, COMMISSIONER                                              DEFENDANT
SOCIAL SECURITY ADMINISTRATION
_____

REPORT AND RECOMMENDATION OF
UNITED STATES MAGISTRATE JUDGE

This cause is before the undersigned United States Magistrate Judge for a Report and Recommendation regarding the appeal by Karren M. Abel of the Commissioner of Social Security's final decision denying Abel's application for a period of disability and Disability Insurance Benefits (DIB).  In rendering this recommendation regarding Abel's appeal, the Court has carefully reviewed the administrative record regarding Abel's claims [including the administrative decision, the medical records and a transcript of the hearing before the Administrative Law Judge ("ALJ")]; the Plaintiff's Motion for Summary Judgment and accompanying brief, as well as the Defendant's Motion to Affirm the Decision of the Commissioner and accompanying brief.  For the reasons discussed in this Report and Recommendation, the undersigned recommends that the Plaintiff's Motion for Summary Judgment (Docket No. 9) be denied, and that the Defendant's Motion to Affirm the Decision (Docket No. 14) be granted.

I. FACTS

A.  Procedural History

Abel was born on August 21, 1960, and applied for a period of disability and Social

Security disability insurance benefits (DIB) in July 14, 2005, with an alleged onset date of April 29, 2005, because of pancreatitis and neuropathy in her feet.[1] Docket No. 6-4 at 7; Docket no. 6-7 at 3.  She was forty-seven (47) years old on the date she was last insured, December 31, 2007. Docket No. 6-4 at 13. Abel's claim was initially denied and was denied upon reconsideration on May 15, 2006. Plaintiff requested and received an administrative hearing.  During the hearing, the Plaintiff testified.  The ALJ also solicited the testimony of a vocational expert, who was cross-examined by the Plaintiff's counsel.  Plaintiff's counsel questioned the vocational expert about the basis for his testimony, his testimony in response to the ALJ's questions, and jobs available that were limited to simple repetitive tasks. Following the October 10, 2008, hearing, the ALJ issued a decision which denied benefits.

## B.  Hearing Decision

In his decision, the ALJ found that although the Plaintiff has the severe impairments of post pancreatitis and surgery, history of bilateral lower extremity pain with no known etiology, and depressive disorder, Abel did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1525 - 404.1526).  The ALJ found that her mental impairment did not meet or medically equal the criteria of listing 12.04, paragraph B or C.  Although the ALJ did find that she has mild restriction in daily living, moderate difficulties in social functioning, and moderate limitations in her concentration, persistence or pace, he found that she did not have any

---

[1] Although Plaintiff does not list "depressive disorder" as a basis for disability in her initial applications for benefits (Docket No. 6-6 at 1-10) or in the disability report (Docket No. 6-7 at 12), she has pursued depression as a basis for disability during the hearing process. ( Docket No. 6-5 at 10)(Explanation of Determination).

episodes of decompensation.[2]  Docket No. 6-4 at 10-11.  He also concluded, under paragraph "C," that her affective disorder has not caused more than a minimal limitation of ability to do any basic work activity. Considering her limitations and the record, the ALJ concluded that through the date she was last insured, December 31, 2007, the Plaintiff had the residual functional capacity to perform light work as defined in 20 C.F.R. § 404.1567(b) with certain limitations. Docket No. 6-4 at 11.  Those limitations are that the Plaintiff can only stand/walk four hours in intervals of one hour in an eight hour workday; and she can occasionally stoop, kneel, crouch, crawl, and balance. He also found that because of her depressive disorder, she can only perform simple tasks.  Id.

In reaching his decision, he also accounted for her residuals from pancreatitis, such as inconsistent fever, nausea, long-term treatment, nerve damage in feet, poor balance, and extremely slow walk.  He found that Abel's medically determinable impairments could reasonably be expected to cause some of her alleged symptoms, however, her statements regarding the intensity, persistence and limiting effects of these symptoms were not credible to the extent that they were inconsistent with his residual functional capacity assessment. He recounted parts of her medical record, taking into account treatment for pancreatitis, neuropathy, and pain in her feet, legs, and back. Id. at 10-11.

Considering her past relevant work as a general office clerk, which is categorized as light, semiskilled work, and considering her residual functional capacity in consultation with a vocational expert, the ALJ concluded that the Plaintiff was unable to perform past relevant work.

---

[2]Decompensation is defined as the "appearance or exacerbation of a mental disorder due to failure of defense mechanisms." Stedman's Medical Dictionary 445 (26th ed. 1995).

Even so, when the ALJ considered her age, education (high school and one year of college), work experience (sales and logistics clerk for 12 and one-half years) (Docket No. 6-3 at 6), and residual functional capacity, he determined that she was not disabled because jobs existed in significant numbers in the national economy that she could perform. Docket No. 6-4 at 13-14. Specifically, he concluded that she could perform three unskilled, sedentary occupations: Addresser; Order Clerk, Food and Beverage; and Charge-Account Clerk. Id. at 14. Thus, the ALJ concluded that the Plaintiff was not under a disability at any time from April 29, 2005, the alleged onset date, through December 31, 2007, the date she was last insured. Id. at 14.

### C. Medical History

The undersigned has reviewed the medical records and has determined that a detailed recitation of the records is not necessary in this Report and Recommendation. However, the Court finds that a brief review of the Plaintiff's medical records will aid in the consideration of this case.

After her husband died in 2001, the Plaintiff was admitted by Dr. Kristan K. Gupta, to St. Dominic's Hospital, Jackson, Mississippi, from November 13 to 22, 2002, for treatment. Docket No. 6-8 at 11. She was diagnosed with a recurrent major depressive disorder, without psychotic feature, alcohol dependence, personality disorder with passive/aggressive trait and dependent personality, mild obesity, backache, tingling in hands and feet, and diarrhea. Id. The Plaintiff declined electroconvulsive therapy and treatment for chemical dependency. Id. at 12. The doctor indicated that she wanted to see the Plaintiff on an outpatient basis on a regular basis, not sporadically. Id. There is no indication in the record that the Plaintiff sought further outpatient treatment from Dr. Gupta.

Approximately two and one-half years later, Abel was admitted by Dr. Gina Heath to Mississippi Baptist Medical Center on June 19, 2005, for treatment of severe alcoholic pancreatitis with formation of multiple pseudocysts. Id. at 51.[3] She was discharged on July 27, 2005. Id. While she was hospitalized, she was treated in the intensive care unit for multiple system organ failure and severe pancreatitis, including respiratory failure and a chronic tracheostomy. Id. at 51, 175. She underwent surgery to drain the pseudocysts and was treated with antibiotics. Id. at 51. During her course of treatment, the doctors also detected a fistula[4] between her colon and one of the pseudocysts. Id.

In a letter dated September 19, 2005, her treating physician, Dr. Gina Heath, noted that Abel's pseudocysts had become infected during her hospital stay, thus causing Abel to develop sepsis. Id. at 163. In addition, she had suffered a "massive GI bleed" from a pseudocyst requiring emergency surgery. Id. The doctor concluded that Abel would be completely unable to work for some time due to this condition, which could be chronic. Id. The doctor also noted that Abel has "severe peripheral neuropathy" in her feet, which was described by a treating neurologist, Dr. Gerald Randle, as "nonreversible." Id.[5] Dr. Heath stated that Abel "should be a

---

[3]At the hearing, Abel denied any use of alcohol since April 2005. Docket No. 6-3 at 26-27.

[4]A fistula is defined as an "abnormal passage from one epithelialized surface to another epithelialized surface." Stedman's Medical Dictionary 657 (26th ed. 1995).

[5]The Court notes that although this diagnosis is attributed to the neurologist, Dr. Randle, by Dr. Heath in her letter, there are no doctor's notes from Dr. Randle in the record. Further, the request to Dr. Randle for medical records by the Office of Disability Determination Services was returned to that Office with a written note stating that Mrs. Abel "was not seen in our office." Docket No. 6-8 at 306. At the hearing, Mrs. Able stated that Dr. Randle diagnosed her peripheral neuropathy while she was in the hospital. Docket No. 6-3 at 25-26.

candidate for disability." Id.

Abel was readmitted by Dr. Heath to Mississippi Baptist Medical Center on August 15, 2005, for an infected pancreatic pseudocyst. Id. at 173. Records indicate a secondary diagnosis of peripheral neuropathy. Id. at 172. An abscess was detected and drained, a drainage catheter was installed, and after treatment with antibiotics, she was released on August 19, 2005. Id. at 173, 184.

Over the following months, Abel underwent followup CT scans of her abdomen. A follow up CT scan on August 25, 2005, of her abdomen indicated that Abel's condition improved somewhat because a fluid collection point or pseudocyst had reduced in size. Id. at 193. Another CT scan conducted on September 6, 2005, indicated that her fluid collection points, or pseudocysts, continued to decrease in size such that one drainage catheter of two was removed. Id. On October 6, 2005, a CT scan revealed no abscesses, but the pancreas still appeared to show "inflammatory changes" consistent with "early or mild pancreatitis." Id. at 202.

Other medical records indicate that Abel was treated by the Trinity Pain Clinic for pain in her feet and legs from November 2005 to August 2008. Docket No. 6-9 at 50-57. She was treated with a variety of medications, including Avinza, Lyrica, Tylox, Keflex, Elavil, Provigil, and Premarin. Id. She also sought pain relief using a spinal cord stimulator, but she indicated that it only gave her 10% relief from the pain. Id. at 45. The records indicate that the doctors closely monitored her medications and their effectiveness, and that she visited the clinic about once per month during this time period. Id. at 2 to 40.

Dr. William Lewis of the Forest Family Practice Clinic, Forest, Mississippi, performed a consultative medical examination on February 15, 2006. Docket No. 6-8 at 280-282. The doctor

commented that Abel cried "uncontrollably through about 80 percent of the history and physical exam." Id. at 281.  The doctor noted that Abel could walk on her heels and toes but found it difficult to do because of the pain in her feet.  Id. at 282.  He also noted that she found "it difficult to squat and recover and I'm not sure why" and that there was "no tenderness of the lower extremities."  Id.  The doctor's diagnostic impression was depression, bilateral lower extremity neuropathy of unknown cause, and history of severe gallstone pancreatitis.  Id.

Dr. Jan P. Boggs, Ph.D., performed a comprehensive mental status examination on April 4, 2006, because of the plaintiff's "alleged depression and memory problem."  Id. at 284 - 287.  Dr. Boggs determined that Abel had an "agitated depression" that "interfered with administration of the memory scale."  Id. at 287.   Dr. Boggs also concluded that Abel

> was in pain and very reactive to it.  With the level of distress registered here she would not be able to relate to others in a job situation but apparently still has social contacts and looks after her children.  She is also able to handle her money and pay bills.  She is taking pain medication but without much apparent benefit and this could be contributing to her depression.  Better pain management is needed and perhaps psychotherapy could be a valuable adjunct to this.

Id.

A medical consultant conducted a Mental Residual Functional Capacity ("RFC") Assessment on May 15, 2006.  Id. at 288-291. The reviewer concluded that Plaintiff's mental RFC allowed for routine, repetitive tasks, that Plaintiff could "concentrate adequately and attend to tasks to the extent that simple work is possible."  Id. at 290.   He also determined that the claimant could "avoid hazards, remember and understand basic tasks and carry them out," and that she could "relate to co-workers and supervisors and can psychologically complete a normal workweek."  Id.  He concluded that there were "no severe limitations that would preclude simple

work." Id.

As a part of the Mental RFC Assessment, the reviewer completed a Psychiatric Review Technique, dated May 15, 2006, and determined that Abel had a Category 12.04 affective disorder, with a disturbance of mood attributable to an unspecified disorder with anxiety. Id. at 295. The reviewer found that she had a mild degree of limitation in restriction of activities of daily living, moderate degree of limitation of difficulties in maintaining social functioning, moderate degree of limitation of difficulties maintaining concentration, persistence or pace, and no episodes of decompensation. The reviewer concluded that Abel's "legitimate mental restrictions are moderate in all probability and would not prevent simple work." Id. at 304.

A medical consultant also performed a Physical Residual Functional Capacity Assessment on March 20, 2006. With regard to exertional limitations, the consultant found that Abel could occasionally lift fifty pounds, frequently lift twenty-five pounds, stand and/or walk about six hours in an eight hour workday, sit about six hours in an eight hour workday, and had no restrictions on her ability to push and/or pull. Docket No. 6-8 at 267. With regard to postural limitations, the consultant found that she could frequently climb ramps/stairs and ladder/rope/scaffolds, balance, stoop, kneel, and crawl. Id. at 268. She could occasionally crouch. Id. The consultant found no manipulative, visual, communicative, or environmental limitations. Id. at 269-270.

With these medical records in mind, the Court turns to consider the standard of review employed in these cases.

## II. STANDARD OF REVIEW

The undersigned recognizes that this Court's review is limited to an inquiry into whether there is substantial evidence to support the Commissioner's findings, Richardson v. Perales, 402 U.S. 389, 390, 401 (1971), and whether the correct legal standards were applied. 42 U.S.C. § 405(g); Falco v. Shalala, 27 F.3d 160, 163 (5th Cir. 1994); Villa v. Sullivan, 895 F.2d 1019, 1021 (5th Cir. 1990). The Fifth Circuit has defined the "substantial evidence" standard as follows:

> [s]ubstantial evidence means more than a scintilla, less than a preponderance, and is:
> such relevant evidence as a reasonable mind might accept to support a conclusion. It must do more than create a suspicion of the existence of the fact to be established, but "no substantial evidence" will be found only where there is a "conspicuous absence of credible choices" or "no contrary medical evidence."

Abshire v. Bowen, 848 F.2d 638, 640 (5th Cir. 1988)(quoting Hames v. Heckler, 707 F.2d 162, 164 (5th Cir. 1983)(citations omitted)). In applying the substantial evidence standard, the court must carefully examine the entire record but must refrain from re-weighing the evidence or substituting its judgment for that of the Commissioner. Ripley v. Chater, 67 F.3d 552, 555 (5th Cir. 1995). Conflicts in the evidence and credibility assessments are for the Commissioner and not for the courts to resolve. Martinez v. Chater, 64 F.3d 172, 174 (5th Cir. 1995). Hence, if the Commissioner's decision is supported by the evidence, and the proper legal standards were applied, the decision is conclusive and must be upheld by this court. Paul v. Shalala, 29 F.3d 208, 210 (5th Cir. 1994), overruled on other grounds, Sims v. Apfel, 530 U.S. 103, 120 S.Ct. 2080, 147 L. Ed. 2d 80 (2000).

## III. DISCUSSION OF THE ALLEGED ERRORS
## AND APPLICABLE LAW

The Plaintiff sets forth one main issue on appeal with four sub-issues, as follows:

Because the Vocational Expert's testimony is unreliable, the ALJ's Step 5 finding that Ms. Abel can perform other work in the national economy is unsupported by substantial evidence.

A. All the occupations named by the Vocational Expert as within Ms. Abel's residual functional capacity demand more complex tasks than the ALJ held Ms. Abel can perform.

B. A conflict between a vocational expert's testimony and *Dictionary of Occupational Titles* information must be resolved before such testimony can support a finding that the claimant is "not disabled."

C. The record in the present case does not reflect a reasonable supporting basis for accepting the Vocational Expert's testimony over the conflicting *Dictionary of Occupational Titles'* information.

D. The Commissioner's Step 5 finding is left unsupported by evidence sufficient to carry his affirmative burden of proof.

Although the Plaintiff has set forth these issues separately, it appears to the undersigned that the main dispute between the parties on this appeal concerns the ALJ's reliance on the Vocational Expert's testimony in concluding that the Plaintiff can perform the jobs of Addresser, Order Clerk, Food and Beverage; and Charge-Account Clerk. Essentially, the Plaintiff argues that the jobs identified by the Vocational Expert require more complex skills and/or tasks than the Plaintiff is capable of performing. Put another way, the Plaintiff argues that the jobs identified by the Vocational Expert are beyond her Mental Residual Functional Capacity. Furthermore, the Plaintiff asserts that the Vocational Expert's testimony conflicts with the Dictionary of Occupational Titles because the Mental Residual Functional Capacity required for the jobs chosen by the Vocational Expert is beyond the Mental Residual Functional Capacity

possessed by the Plaintiff.  Therefore, according to the Plaintiff, the Vocational Expert's testimony conflicts with the <u>Dictionary of Occupational Titles</u>.  Thus, the Plaintiff argues that the ALJ's reliance upon the Vocational Expert's testimony, and his resulting failure to recognize the conflict, fail to provide a reasonable supporting basis for the ALJ's decision. According to the Plaintiff, it follows that the Commissioner's decision is not supported by sufficient evidence and must be reversed.

The Government counters that the ALJ properly handled the Plaintiff's limitations and the Vocational Expert testimony.  The Government further asserts that, upon questioning by the Plaintiff's counsel, the Vocational Expert testified that the Plaintiff could perform work, even when considering the moderate limitations on the checklist of limitations completed by the state agency consultant.  Docket No. 6-3 at 32.  The Government also points out that the Plaintiff's counsel specifically questioned the Vocational Expert regarding the relationship between Plaintiff's limitation to simple repetitive tasks and the jobs he testified the Plaintiff could perform.  <u>Id.</u> at 36.

According to the Plaintiff, the occupations of Addresser, Order Clerk, and Charge-Account Clerk, as chosen by the Vocational Expert, require Reasoning Development Levels of 2 and 3.[6]  Level 3 requirements are as follows: "Apply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form.  Deal with problems involving several concrete variables in or from standardized situations."   Level 2 states in part that these

---

[6]The <u>Dictionary of Occupational Titles</u> rates the "general education development" (GED) for each listed occupation.  It is composed of three divisions: reasoning development, mathematical development, and language development.  Reasoning development is rated on a scale of six levels, with level 1 being the lowest and level 6 being the highest.

jobs require the ability to carry out detailed but uninvolved instructions, while Level 1 requires the ability to carry out simple one- or two-step instructions.  The Plaintiff asserts that the jobs of Addresser, Order Clerk, and Charge-Account Clerk, at Levels 2 and 3, outpace Ms. Abel's mental Residual Functional Capacity for only "routine, repetitive tasks."  Thus, the main question before the Court, as framed by the parties, is whether the ALJ erred in accepting the Vocational Expert's testimony without first resolving the alleged conflict between that testimony and the Dictionary of Occupational Titles.

     As Plaintiff has pointed out, the various circuit courts have approached this issue in a variety of ways.  However, this Court finds the Fifth Circuit's opinion in Carey v. Apfel, 230 F.3d 131 (5th Cir. 2000), controlling under the particular facts of this case.  While certainly an argument can be made that the ability to perform only simple, repetitive tasks is inconsistent with Level 3 reasoning, the two are not in obvious, direct conflict.  Thus, the court does not believe it was reversible error, in and of itself, for the ALJ to fail to question the Vocational Expert about the possible conflict.  Indeed, although the Plaintiff's attorney posed questions to the Vocational Expert regarding Abel's mental functional capacity limitations (referring to her "18 moderate limitations") in relation to the jobs the Vocational Expert had identified for the Plaintiff, and the Vocational Expert testified that she could still perform the jobs he had identified with her moderate limitations, Plaintiff's attorney did not point out any obvious or direct conflict between the Vocational Expert's testimony and the Dictionary of Occupational Titles.  Docket No. 6-3 at 30-37.  In fact, the Plaintiff's attorney elicited clarification from the Vocational Expert on the complexity of the jobs the Vocational Expert had identified by making sure that those jobs could be classified as  "simple one, two step instruction with little or no variation."  Id. at 37.

As the Court stated in Carey, "claimants should not be permitted to scan the record for implied or unexplained conflicts between the specific testimony of an expert witness and the voluminous provisions of the DOT, and then present that conflict as reversible error, when the conflict was deemed sufficient to merit adversarial development in the administrative hearing." Cary, 230 F.3d at 145-147.  Moreover, as the Fifth Circuit observed in Carey, the Dictionary of Occupational Titles job descriptions are not comprehensive and should not be given a role that is exclusive of the Vocational Expert's testimony as to whether a particular claimant can perform a particular job.  Rather, because the conflict raised by Plaintiff was merely an indirect one, the question under Carey is simply whether the record reflects an adequate basis for the ALJ's reliance on the Vocational Expert's testimony.  Here, the ALJ presented to the Vocational Expert a hypothetical that contained all the limitations supported by the record, and the Vocational Expert responded by stating that such a person could perform the three jobs of Addresser, Order Clerk, and Charge-Account Clerk.  Although the Plaintiff's counsel questioned the Vocational Expert by posing additional limitations on the hypothetical such as fingering and reaching limitations, as well as moderate mental limitations, the Vocational Expert's testimony was not challenged or contradicted in any manner.  The Court, therefore, concludes that the record reflects an adequate basis for the ALJ's reliance on the Vocational Expert's testimony.

## IV. CONCLUSION

Accordingly, the Court concludes that there is substantial evidence to support the Commissioner's decision and that no reversible errors of law were committed by the ALJ. Therefore, the undersigned recommends that the decision of the Commissioner should be affirmed.

The parties are hereby notified that failure to file written objections to the proposed findings, conclusions, and recommendation contained within this report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court. 28 U.S.C. §636; Fed. R. Civ. P. 72(b)(as amended, effective December 1, 2009); Douglass v. United Services Automobile Association, 79 F.3d 1415, 1428-29 (5th Cir. 1996).

Respectfully submitted, this the 2nd day of March, 2011.

    /s/ F. Keith Ball
UNITED STATES MAGISTRATE JUDGE